[Civ. No. 2969.   Third Appellate District.—January 15, 1926.]

## L. F. BRICHETTO et al., Respondents, v. F. A. RANEY et al., Defendants; FIDELITY TRUST & SAVINGS BANK (a Corporation), Appellant.

[1] MORTGAGES — ACTION TO FORECLOSE — VERDICT — FINDINGS — AP-PEAL.—In an action for the foreclosure of a mortgage given to secure a promissory note and taxes, where the jury returned a verdict in favor of plaintiffs by way of answers to special issues of fact submitted to them, and the trial court made findings in accord with the answers returned to the interrogatories, the question whether the decision of the trial court is or is not supported by the evidence is referable to the findings and not to the verdict of the jury.

[2] ID.—EQUITABLE CHARACTER OF ACTION—RECOVERY OF TAXES.—An action for the foreclosure of a mortgage based upon the default of the defendant to pay the interest, as provided in a promissory note, and taxes, is purely one of an equitable character and of equitable cognizance; and it cannot be maintained that because a recovery for taxes is also sought in the action that the suit is transformed into a mixed equitable and law action.

[3] ID.—PAYMENT OF TAXES—PROVISION IN MORTGAGE—JUDGMENTS.— In such action, where the matter of the payment of taxes by the mortgagor was provided for in the mortgage, upon the default by the mortgagor in the payment thereof and their payment by the mortgagee, they became as much a part of the mortgage indebtedness as was the principal or original obligation itself; and the plaintiffs were entitled to have embraced in the decree of fore-closure not only a provision for the satisfaction of the loan evidenced by the promissory note, to secure which was the primary object of the mortgage, but one for all claims which arose by reason of the nonpayment by the mortgagor of any taxes or assess-ments imposed upon the property which the mortgage provided should become a lien on the land.

[4] ID.—DEFICIENCY JUDGMENT—EQUITABLE CHARACTER OF ACTION NOT CHANGED.—The fact that in a suit for the foreclosure of a mort-gage lien the court is 'vested with the jurisdiction to enter a deficiency or personal money judgment against the mortgagor or the defendant liable for the debt, in case the sum for which the mortgaged property has been sold under the decree of foreclosure

1.   See 24 **Cal. Jur.** 899.
3.   See 17 **Cal. Jur.** 1078.
4.   See 18 **Cal. Jur.** 276.

is insufficient to satisfy the debt secured by the mortgage, does not take from the proceeding its equitable character.

[5] ID.—EQUITY CASES—JURY TRIALS.—The right to a trial by jury does not apply to equity cases, and one of the inherent and most conspicuous attributes of chancery courts is that parties appealing thereto for the adjudication of rights appropriate to that forum are not entitled as a matter of right to a trial by a jury of the issues of fact arising therein; and conversely, the allowance of a jury in a suit calling entirely for equitable relief is wholly *ex gratia.*

[6] ID.—EQUITY—FINDINGS OF JURY—ADVISORY CHARACTER OF—FINDINGS BY COURT.—The finding of the jury in a suit calling entirely for equitable relief is merely of an advisory character upon the issues of fact; and the verdict may be disregarded and findings contrary thereto made by the chancellor or, if the verdict be adopted, it is still incumbent upon the chancellor to make findings.

[7] ID.—CONVEYANCE BY MORTGAGOR TO BANK—TRUSTS—ASSUMPTION OF MORTGAGE—FINDINGS—EVIDENCE.—In this action for the foreclosure of a mortgage, the findings that the defendant bank took a conveyance of the mortgaged premises from the mortgagor for itself or in its own behalf, and not as trustee for third parties, and that said bank, at the time of the delivery of the deed to it, agreed to assume the payment of the mortgage, are unsupported by the evidence.

[8] ID.—CONVEYANCE SUBJECT TO MORTGAGE—ASSUMPTION OF MORTGAGE—DISTINCTION BETWEEN—LIABILITIES OF PARTIES.—There is a broad distinction, in the effect thereof upon the rights of the parties, between the taking of mortgaged property subject to a mortgage subsisting thereon at the time of such taking and the assumption or agreement by the grantee to pay the debt secured by such mortgage, in that, where the purchaser or grantee of the mortgaged property takes it *subject* to the mortgage only, there being no expressed or implied agreement to assume the mortgage debt, he is bound only to the extent of the property, but if the debt be assumed by the grantee he becomes the principal debtor, while the mortgagor becomes the surety.

[9] ID.—ASSUMPTION OF DEBT—PAROL TESTIMONY—CHARACTER OF.—If there is nothing in the deed itself clearly indicating an assumption by the grantee of the debt secured by the mortgage, and there is no written agreement extrinsic to the deed to that effect, then proof by parol testimony that such an agreement was made must be clear and of the most satisfactory character.

---

5.  See 15 **Cal. Jur.** 331; 61 **R. C. L.** 209.

6.  See 24 **Cal. Jur.** 898; 16 **R. C. L.** 214.

8.  See 18 **Cal. Jur.** 28, 41.

9.  See 18 **Cal. Jur.** 48.

[10] ID.—BANK ACTING IN TRUST CAPACITY—OWNERSHIP OF LAND—STATEMENT IN AFFIDAVIT.—In such action, the statement by the bank that it was the owner of the mortgaged premises, contained in an affidavit supporting its claim to a portion of the crop produced on the land against any right of a receiver to maintain possession of the same, was not inconsistent with its relation as a trustee to said property, where for the purpose of administering the offices of the trust, it was the owner of the land.

[11] ID. — TRUSTS — PARTIES. — In a suit to recover moneys due the trust estate, or for damages for trespass upon the trust property, the bank, as trustee of an express trust and holder of the legal title to the trust property, could have sued in its own name and without the joining therein as coplaintiffs the *cestui que trustent.*

[12] ID.—VALIDITY OF TRUST—SECTION 869A, CIVIL CODE—EQUITY—RESULTING TRUST.—In such action, conceding that the trust arising from the conveyance of the mortgaged premises to the bank for the benefit of third parties was void under section 869a of the Civil Code, in so far as are concerned innocent purchasers of said land, for a valuable consideration, it was not void as between the bank and said third parties; and the latter having paid the consideration for the transfer of the property to the bank, a trust is presumed to result in their favor, and a court of equity would promptly enforce it.

[13] ID.—CAPACITY IN WHICH CONVEYANCE WAS TAKEN—VALIDITY OF TRUST—ASSUMPTION OF DEBT.—In such action, where the defendant bank took the conveyance merely as a trustee, that fact, regardless of whether the trust was void under sections 869a, 2221, and 2222 of the Civil Code or for any reason, would not only be competent but convincing evidence that the claim that it assumed the payment of the note secured by the mortgage was not true or well founded.

[14] ID.—KNOWLEDGE BY MORTGAGOR OF TRUST—FINDING—EVIDENCE.—In such action, the finding that the mortgagor, at the time of the conveyance to the defendant bank, had no notice or knowledge that the bank took and accepted such conveyance as a trustee for third parties or for the benefit of the latter is unsupported.

[15] ID.—EQUITABLE ESTOPPEL—SILENCE OF PARTY—EVIDENCE.—Where the defense of equitable estoppel is set up as against the assertion of a substantive right, and the ground of the estoppel is conduct by silence on the part of the party against whom the defense is pleaded, the facts proved must be such that an estoppel is clearly deducible from them; in other words, estoppel by conduct founded upon the silence of the party whose duty it is to speak

11.   See 25 Cal. Jur. 351; 26 R. C. L. 1343.
15.   See 10 R. C. L. 63.

and so expose all the material facts of a transaction which are within his knowledge and of which the other party is ignorant, involves an implied representation of the existence of the apparent facts of the transaction, and, to justify a prudent man in acting upon it, it must be plain, not doubtful, or matter of questionable inference.

[16] ID.—LIABILITY OF BANK—ESTOPPEL—EVIDENCE.—In such action, the plea of estoppel upon which the mortgagor and the mortgagees solely relied to establish and fix liability upon the defendant bank for a deficiency judgment is not supported by any testimony with the degree of certainty which is and should always be required before a court of equity will, solely upon such plea, interpose to deprive a person of his property.

(1) 4 C. J., p. 898, n. 92.   (2) 27 Cyc., p. 1513, n. 31.   (3) 27 Cyc., p. 1657, n. 63.   (4) 27 Cyc., p. 1513, n. 31.   (5) 21 C. J., p. 585, n. 99; 35 C. J., p. 159, n. 33, p. 160, n. 35.   (6) 21 C. J., p. 594, n. 85, p. 596, n. 87, 88; 35 C. J., p. 160, n. 36.   (7) 4 C. J., p. 898, n. 92; 27 Cyc., p. 1754, n. 84 New.   (8) 41 C. J., p. 717, n. 79, p. 737, n. 77, p. 743, n. 90.   (9) 41 C. J., p. 730, n. 77.   (10) 21 C. J., p. 1224, n. 25.   (11) 39 Cyc., p. 456, n. 19.   (12) 39 Cyc., p. 118, n. 5, p. 588, n. 27.   (13) 41 C. J., p. 730, n. 77.   (14) 4 C. J., p. 844, n. 68; 41 C. J., p. 730, n. 77.   (15) 21 C. J., p. 1139, n. 96, p. 1151, n. 92.   (16) 21 C. J., p. 1252, n. 93, p. 1253, n. 95.

APPEAL from a judgment of the Superior Court of Stanislaus County. L. W. Fulkerth, Judge. Reversed.

The facts are stated in the opinion of the court.

Harris, Johnson, Willey & Griffith for Appellant.

F. W. Reeder, L. J. Maddux and Griffin, Boone & Boone for Respondents.

HART, J.—This action was brought to foreclose a mortgage upon a certain tract of land of 963 acres, more or less, and executed by one F. A. Raney, to secure a promissory note made by him in favor of the plaintiffs for the sum of $45,000. The note and the mortgage were made and executed on the fourth day of September, 1920, the note to become due and payable five years from the date thereof. It provided for the payment of interest at the rate of six per cent per annum, said interest to be paid semi-annually, and if not paid as it became due, was to be added to the

principal and become a part thereof and bear interest at the same rate. It was further provided in said note that if default be made in the payment of interest as provided therein, "then this note shall immediately become due and payable at the option of the holder thereof."

The mortgage provided, among other things, that it "is also intended to secure, and does hereby secure, the payment of all liens, encumbrances, charges and the counsel fee herein mentioned, said counsel fee to become payable and be allowed if suit be commenced to foreclose this mortgage"; that the mortgagees, their heirs, successors, and assigns, may lawfully pay and discharge at maturity "all liens or other encumbrances now subsisting or hereafter to be laid or imposed upon said lot of land and premises, and which may be in effect a charge thereupon, and to insure and keep insured the buildings now or to be erected on said mortgaged premises for at least $1,000.00, and to pay the premiums on such insurance; and such payments shall be allowed, with interest thereon at the rate of eight per cent per annum; and such payments and interest shall be considered as secured by these presents and shall be a charge upon said premises, and shall be repayable on demand," etc. The mortgage also contained a release clause by virtue of which every acre of land embraced within the tract described in any subject to the mortgage upon which the sum of $75 has been paid is to be released from the operative effect of the instrument.

The complaint is in the form usual to actions for the foreclosure of the liens of mortgages. In addition, it alleges that the defendants were in default in the payment of certain county and irrigation taxes assessed against the land, the same aggregating the sum of $6,969.79; that, in accord with the terms of the mortgage, the plaintiffs paid said taxes. It is further alleged that there became due and payable on the fourth day of September, 1921, as for interest on the said note the sum of $1,350, and a like sum as for interest due on the fourth day of March, 1922; that defendants had defaulted in the payment of said interest, and continued to be so in default to the time of the commencement of this action, to wit, the twenty-second day of July, 1922.

It is further alleged that the defendant Bank "is now the owner and holder of said property by bargain and sale deed from F. A. Raney, and assumed the mortgage at the time of receiving said deed and agreed to pay the same, said bank having paid the first installment of interest on said note." It is alleged that "there is now being harvested from said land a wheat crop," of which a one-third part will be delivered to the defendant Bank as its share of said crop; that if defendant Bank "receives said rental from said land they will apply it to their own use and will not apply it to the liquidation of said note; that it is absolutely necessary that the court appoint a receiver *ex parte* to take possession of the premises and receive the rents, incomes and profits thereof pending the litigation and to apply the proceeds thereof under an order of this court."

It is further alleged by plaintiffs that the defendants have breached the covenants and conditions of said note and mortgage and that they (plaintiffs) "have elected and do now elect to exercise the option by said note provided and to declare and do declare all of said note, etc., due and payable."

The prayer is for judgment against Raney and the defendant Bank for the sum of $45,000, the principal sum of the note, together with interest falling due from time to time according to the terms of the note, for taxes paid by plaintiff by virtue of assessments levied by the county of Stanislaus and the Oakdale Irrigation District upon said land, in the payment of which defendants are alleged to have defaulted, for any deficiency which may be found to exist in the amount necessary to satisfy the judgment, interest, and costs upon the sale of the property, and for an order appointing a receiver, *pendente lite,* to take possession of the property and to receive the rents and profits thereof, and to hold the same subject to the disposition thereof to be made by the court.

By a supplemental complaint, the plaintiff stated that, subsequent to the institution of this action, taxes assessed upon the land for county and irrigation purposes became due and payable, said taxes totaling the sum of $4,186.47, and that plaintiffs, by reason of the default of the defendants in the matter of the payment of the same, and to prevent the sale of the property for the satisfaction of said

taxes, paid all said taxes; that the same were and are a lien on the mortgaged premises, and prays judgment for the said sum of $4,186.47 in addition to the sum asked in the original complaint.

The larger portions of the complaint are denied by the defendant Bank on information and belief. Said defendant, however, directly denies that it breached the covenants and conditions of the note and the mortgage, or those of either of them, and alleges that, while the defendant, Raney, by deed, dated September 4, 1920, conveyed to it the land described in the complaint and that thus it acquired the legal title thereto, it took said title in trust for W. W. Stanforth and Hugh Blair, who were, therefore, the equitable owners of said land and beneficiaries of said trust. The said defendant, in its answer, explains its connection with the lease of said land to the plaintiffs herein, and of which more will be said later on in this opinion.

The defendant, Raney, filed a separate answer, in which he also denies, on information and belief, nearly all of the allegations of the complaint; directly denies that (as the complaint alleges) from the sale of the land under the decree of foreclosure there will not be realized a sufficient sum to satisfy the judgment or that there will be such a deficiency in the amount for which the land is sold as to require or justify the entering of a deficiency judgment against the defendants and in favor of plaintiffs.

Raney also filed a cross-complaint and thereafter amended the same. Therein he sets forth in detail an account of all the transactions culminating in the conveyance by him to the Bank of the land described in the complaint, and alleges that said Bank, at the time the transfer of the land was made to it, agreed to assume and pay the debt to secure which the mortgage herein involved was given. He also sets up an estoppel as against the defendant Bank, alleging in that behalf that, assuming that the Bank took the conveyance solely as a trustee or in trust for the benefit of Stanforth and Blair, the said defendant did not at that time apprise or notify him of that fact, but its silence in that particular led him to infer and believe that it took the conveyance entirely for itself or as an absolute transfer of the whole title of the land to it.

The plaintiffs answered Raney's cross-complaint and therein admitted to be true the allegation therein that, ''as a part of the consideration, to the amount of $45,000.00, for said conveyance, the said . . . bank assumed the payment of said note and mortgage,'' etc., but affirm that both Raney and the defendant Bank are severally and jointly liable for the indebtedness evidenced by said note and mortgage, as also for all taxes assessed against the land, and which plaintiffs were compelled to pay by reason of the default of said defendants in that respect. The Bank answered the amended cross-complaint, denying those allegations thereof which involve the claim by the cross-complainant that it assumed the payment of the mortgage indebtedness as a part of the consideration for the conveyance of the land to it. But further consideration herein of the pleadings may be dispensed with, it being sufficient to say that there was a joinder of issue upon all the vitally important questions of fact in the case and that they were, therefore, squarely and clearly submitted for decision.

The cause was tried by a jury, and a verdict returned in favor of plaintiffs by way of answers by the jury to the following special issues of fact submitted to them by the court: 1. ''At the time of the delivery of the deed of September 4th, 1920, by F. A. Raney to the Fidelity Trust & Savings Bank, did F. A. Raney have any notice or knowledge that the bank was trustee for Stanforth & Blair? Answer: No.'' 2. ''Was there an agreement, express or implied, by the Fidelity Trust & Savings Bank, a corporation, to pay the mortgage set forth in the complaint? Answer: Yes.''

The court made findings in accord with the answers returned to the foregoing interrogatories and found as a fact as well as a conclusion of law that the defendant Bank and said Raney were jointly and severally liable, as principal and surety, respectively, for the deficiency found to exist in the amount required to satisfy the judgment, and entered a deficiency judgment accordingly.

The defendant Bank appeals from said judgment upon a record prepared in accordance with the so-called alternative method.

The court specifically found that the Bank took the conveyance of the land described in the complaint from Raney

for itself or in its own behalf, and not as trustee for Stanforth and Blair; that Raney, at the time of the delivery of the deed of conveyance to said land to the Bank, had no notice or knowledge that the Bank took and accepted said conveyance as a trustee for Stanforth and Blair or for the benefit of the latter; that, at the time of the delivery of the said deed to it, the Bank agreed to assume the payment of the note and mortgage and to perform all other covenants and conditions contained in said instruments. The legal integrity of these findings is assailed by the appellant upon the ground that they are not supported by any evidence in the case. Since the findings founded upon the answers returned by the jury to the above interrogatories are absolutely essential to the support of the judgment, it will follow, if the contention that those findings are without the requisite evidentiary support to uphold them, that all the other or what may be termed as subsidiary findings, in so far as they apply to the defendant Bank, must necessarily fail to be of any effect, or, in other words, will be wholly devoid of materiality in the consideration of this appeal. In other terms, without the findings specially referred to above, the judgment as against the appellant cannot stand.

[1] Before taking up for consideration the question whether the findings which follow or approve the special findings of the jury upon the special issues submitted to them as above indicated are supported, we should first dispose of the contention of counsel for the plaintiffs that the court below was bound by the verdict, that the making of findings by the court was wholly supererogatory, that the findings made are entirely without force or effect, and that, therefore, the question whether the decision is insufficiently buttressed evidentially must be determined by reference to the verdict and not to the findings. The contention is obviously unsound. [2] The action here is purely one of an equitable character and of equitable cognizance. It will not be maintained that because a recovery for taxes is also sought in the action that the suit was transformed into a mixed equitable and law action. [3] The matter of the payment of taxes by the mortgagor was provided for in the mortgage and, therefore, upon the default by the mortgagor in the payment thereof and their payment by the mortgagee, they became as much a part of the mortgage indebted-

ness as was the principal or original obligation itself. The plaintiff was entitled to have embraced in the decree of foreclosure not only a provision for the satisfaction of the loan evidenced by the promissory note, to secure which was the primary object of the mortgage, but one for all claims which arose by reason of the nonpayment by the mortgagor of any taxes or assessments imposed upon the property which the mortgage provided should become a lien on the land. But these propositions are so self-evident that the discussion thereof is wholly unnecessary. [4] Nor does the fact that in a suit for the foreclosure of a mortgage lien the court is vested with the jurisdiction to enter a deficiency or personal money judgment against the mortgagor or the defendant liable for the debt, in case the sum for which the mortgaged property has been sold under the decree of foreclosure is insufficient to satisfy the debt secured by the mortgage, take from the proceeding its equitable character. As was said in *Carroll* v. *Deimel,* 95 N. Y. 254, approved by the case of *Downing* v. *Le Du,* 82 Cal. 473 [23 Pac. 193] : "Although a sale of the mortgaged premises might result in a deficiency for which a money judgment could be docketed against the defendant liable for such deficiency, such a judgment was not the sole object of the action, but was an incident of the equitable relief sought." (See, also, *Van Valkenburgh* v. *Oldham,* 12 Cal. App. 572, 579 [108 Pac. 42].) [5] No one will claim that the right to a trial by jury applies to equity cases, for it is too elementary to require argument to support the proposition that one of the inherent and most conspicuous attributes of chancery courts is that parties appealing thereto for the adjudication of rights appropriate to that forum are not entitled as a matter of right to a trial by a jury of the issues of fact arising therein. Conversely, the allowance of a jury in a suit calling entirely for equitable relief is wholly *ex gratia.* [6] The finding of the jury in such case is merely of an advisory character upon the issues of fact, and the verdict may be disregarded and findings contrary thereto made by the chancellor or, if the verdict be adopted, it is still incumbent upon the chancellor to make findings (Code Civ. Proc., sec. 592; *Stockman* v. *Riverside L. & Irr. Co.,* 64 Cal. 57, 58 [28 Pac. 116] ; *Downing* v. *Le Du, supra; Van Valkenburgh* v. *Oldham,* 12 Cal. App. 572 [108 Pac. 42] ; *J. I. Case*

76 Cal. App.—16

*T. M. Co.* v. *Copren,* 45 Cal. App. 159, 167, 168 [187 Pac. 772]; *Vallejo & N. R. Co.* v. *Reed Orchard Co.,* 169 Cal. 544 [147 Pac. 238]; *Carroll* v. *Deimel,* 95 N. Y. 254; *Rochester* v. *Bennett,* 74 Mont. 293 [240 Pac. 384, 387]). It follows that the question whether the decision below is or is not supported by the evidence is referable to the findings and not to the verdict of the jury. And to that question consideration will now be given. W. W. Stanforth and Hugh Blair were, prior to and during the year 1920, engaged, as copartners, in the business of buying and selling real property, their offices being in the city of Fresno, where also they resided. They devoted their activities largely to the buying and subdividing of large tracts of land and selling the same by subdivisions to various persons. Among the lands so purchased and subdivided was a tract of land comprising about 880 acres situated in the county of Madera. Stanforth and Blair, by deed, dated April 23, 1919, conveyed said land to the defendant Bank, then designated and known as "Bank and Trust Company of Central California," with principal place of business at Fresno, but which subsequently was changed to that indicated in the title of this case. At the same time, said Bank and Stanforth and Blair entered into and executed a written agreement, also dated April 23, 1919, wherein and whereby it was agreed that although the said deed to said land was absolute in form, it was made to, and said property was to be held by, said Bank in trust for the benefit of Stanforth and Blair, in accordance with the terms and provisions of said agreement and for the specific purposes therein set forth. The agreement, with much particularity of detail, set forth the terms, conditions, and provisions regulating the administration of the trust and prescribed and declared the respective duties and obligations of the trustee and the trustors. As to these, though, it will be sufficient for our purposes to explain, in a general way, that the agreement provided for the surveying, the platting and the subdividing of the land by the parties of the first part (Stanforth & Blair), and, upon the completion of such platting and subdividing, for the placing of the land upon the market for sale by subdivisions; that Stanforth & Blair should attend to the business of procuring contracts for the purchase of the subdivisions and that the defendant Bank should receive

and disburse, according to the stipulations of said agreement, all moneys paid it by those entering into contracts with it for the purchase of such subdivisions; that all such contracts, or leases or other agreements in writing concerning the sale, the handling, the management or the operation of "the said town property," shall be made in its (said Bank's) name, etc.; that the payment of the costs and expenses "of these trusts, including payment to the second party (bank) for its services hereunder" should be out of the moneys received or collected by the Bank on the sales made under "these trusts." It should be explained that, at the time of the making of the contract between Stanforth & Blair and Raney for the sale by the former and the purchase by the latter of the land under the mortgage concerned herein, and also at the time said land was conveyed to the defendant Bank, a Berkeley (Alameda county) bank held a mortgage on the Madera County land (the subject of said agreement of trust) as security for the payment of a promissory note for the sum of $20,000.

A large number of contracts of sale of the subdivisions of the Madera County lands were made between defendant Bank and various other parties, and payments thereon were made by the purchasers to the defendant Bank. At the time of the conveyance by Raney to the Bank of the land upon which the plaintiffs' mortgage subsists, said Bank had in its possession, holding the same as trustee for Stanforth & Blair, contracts calling for the payment to the Bank, as such trustee, by the several purchasers of subdivisions of the Madera County land, of installments amounting in the aggregate to the sum of $52,000, more or less. Thus Stanforth & Blair owned a net equity in the subdivisions covered by those contracts totaling in value, the sum of $32,000, approximately.

The record appears to be silent as to the particular time at which were begun the negotiations eventuating in the purchase by Raney of the land upon which plaintiffs hold the mortgage which is the subject of this suit. That fact, however, bears no significance here. But it does appear that Raney purchased said land from the plaintiffs, and that the consideration passing from Raney to plaintiffs for the said land (Stanislaus County land, as hereinafter it may be referred to) was the sum of $50,000; that upon the

consummation of the agreement of sale between plaintiffs
and Raney, the latter paid to the former, by virtue of said
agreement, the sum of $5,000 in cash and gave and delivered
to plaintiffs his promissory note for the balance of the pur-
chase price ($45,000) and a mortgage on said land to secure
the payment of said note.

After the last above mentioned deal between Raney and
plaintiffs had been completed, one Cecil Grigsby, a real
estate dealer of Fresno, undertook, and succeeded in start-
ing, negotiations between Stanforth & Blair, on the one
hand, and Raney on the other, looking to the sale of the
Stanislaus County land by the latter to the former. After
inspecting the land, Stanforth & Blair submitted to Raney
a written offer for the purchase of the same. This written
proposal to buy the land was dated at Fresno, August 4,
1920, Therein Stanforth & Blair offered $77,616.71 for the
entire tract of 960 acres, more or less, on the terms therein
specified. Among those terms were the following: That said
proposed purchasers would take the land, "subject to a
mortgage in the sum of $45,000.00," referring to the mort-
gage then existing on the land securing Raney's note to the
plaintiffs for the sum so mentioned, same to bear interest
at the rate of six per cent per annum, payable semi-
annually; that the mortgage will not provide for any payments
on the principal before "approximately five years"; that
said mortgage should contain "a release clause releasing any
portion of said land upon payment of $75.00 per acre for
each and every acre so released"; that, "as a further con-
sideration, we will assign or cause to be assigned certain
contracts issued by the Bank & Trust Company of Central
California, covering property in sections 31 and 32, in
township 12 south, range 17 east, M. D. B. & M., Madera
County, California, and signed by the following people in
the following amounts," following which language is an
enumeration of seven different contracts of sale executed by
as many different persons and the defendant Bank upon
the sale by the latter to the former of subdivisions of the
Madera County land, with the amount owed by each pur-
chaser under his contract set opposite his name. The total
sum of these amounts was $51,950. As before stated, Stan-
forth & Blair owned a net equity in said contracts amount-
ing to the total sum approximately of $32,616. In other

words, that sum represented the total amount over and above the mortgage indebtedness against the property held by the Berkeley bank. The proposal further provided that "said contracts are to remain in trust at the Fidelity Trust and Savings Bank." The foregoing are all the provisions of the offer which need be referred to.

On August 9, 1920, and within the time during which said offer was, as specified therein, to remain open, Raney accepted the proposal in the following language: "I hereby accept the above offer, together with all terms and conditions therein mentioned and agree to pay Cecil Grigsby a brokerage commission as agreed upon." Upon thus completing the agreement to sell and purchase said land, Raney, upon the suggestion of Stanforth & Blair, conveyed the land to the defendant Bank, as heretofore stated. In turn, said Bank assigned to Raney the equitable interests of Stanforth & Blair in the several contracts for the sale of the several subdivisions of the Madera County land described therein. On the fifteenth day of October, 1920, the defendant Bank and the plaintiffs entered into an agreement of lease, whereby the Stanislaus County land was leased by the former to the latter for the term of three years from the said fifteenth day of October upon the consideration that the Bank should receive, as rental, "one-third part of all grain or crops produced or raised on said land during the continuance of this lease," the Bank expressly reserving the right to sell said property at any time during the continuance of the lease. In this connection it may be stated that within due time after the present suit was instituted (the court having appointed a receiver *pendente lite* to take possession and control of the property), the defendant Bank through one of its officers executed and filed an affidavit in said action in support of its claim to the one-third part of the crops harvested on the Stanislaus County land in the year 1922 (the action was brought July 22, 1922) under the terms of the said lease of said land between said Bank and the plaintiffs; that in said affidavit the said Bank declared that it was the owner of said land, and entitled, as against the receiver appointed by the court to the possession of the one-third part of the crops raised and harvested on said land during that year.

The above embraces a general statement of the facts. A review of such of the testimony as is conceived to be necessary will follow; but before proceeding to do so, it is proper at this juncture to say that the testimony of Ralph Vianello and W. H. Fielding, who, at the time of the transfer of the land directly concerned in and with this action by Raney to the Bank, and the testimony of Stanforth, that the said defendant took said conveyance as a trustee, in trust for the benefit of Stanforth & Blair, stand in the record undisputed. The testimony of Stanforth and of said trust officers of the Bank that the contracts relating to the Madera County land were owned by Stanforth & Blair and held by the defendant Bank in trust for them also stand in the record uncontroverted. In fact, Raney himself, in substantially all the letters addressed by him to the Bank concerning the transfer subsequent thereto did so (as will later herein be the more fully shown) upon the assumption that said Bank had taken the conveyance as a trustee for Stanforth & Blair. As to the contracts for the sale of the several subdivisions of the Madera County land, the fact that they were held in trust by said Bank was so plainly indicated in the written offer submitted by Stanforth & Blair to Raney for the purchase of the Stanislaus County land that the latter could not have acquired any other thought or impression than that they were so held by defendant Bank as trustee for Stanforth & Blair. The offer, as has been shown, provided that Stanforth & Blair, ''as a further consideration will assign or cause to be assigned certain contracts (describing them) issued by the Bank & Trust Company of Central California,'' and further provided that ''Said contracts are *to remain in trust* at the Fidelity Trust & Savings Bank.'' Mr. Raney, himself a banker, certainly, when accepting said offer, could not have misapprehended the real meaning or import of those provisions. [7] Thus warrantably it may be and, indeed, it is to be held, as a matter of law, that, upon the testimony, it stands in the record in this case as an established fact that the defendant Bank did take the legal title to the property solely in trust for the benefit of Stanforth & Blair, and that the latter were, at all times, from the date of the conveyance, not only the equitable but the beneficial or real legal owners thereof. Nor is there disclosed by this record any evidence, either

direct or circumstantial, with the possible exception of the mere circumstance that the land was conveyed to the Bank by Raney, that lends any support to the finding that the defendant Bank on taking the conveyance, or at any other time, agreed to assume the payment of the debt secured by the mortgage, and that circumstance alone possesses no probative force as in proof of such an agreement for the reason, among others, that the deed to the Bank does not so provide but expressly and specifically provides that the conveyance thus effected is *subject* to the mortgage; [8] and there is a broad and obvious distinction, in the effect thereof upon the rights of the parties, between the taking of mortgaged property subject to a mortgage subsisting thereon at the time of such taking and the assumption or agreement by the grantee to pay the debt secured by such mortgage, in that, where the purchaser or grantee of the mortgaged property takes it *subject* to the mortgage only, there being no express or implied agreement to assume the mortgage debt, he is bound only to the extent of the property, but if the debt be assumed by the grantee, he becomes the principal debtor, while the mortgagor, as is the theory of the findings in this case, becomes the surety. (Jones on Mortgages, 7th ed., sec. 751; *Roberts* v. *Fitzallen,* 120 Cal. 482 [52 Pac. 818].) [9] If there is nothing in the deed itself clearly indicating an assumption by the grantee of the debt secured by the mortgage, and there is no written agreement extrinsic to the deed to that effect, then proof by parol testimony that such an agreement was made must be clear or of the most satisfactory character. As stated, no express parol agreement was shown. Raney himself did not testify that any such agreement was made by the Bank with him. As far as he went in that respect was to say that it was his "understanding" or that he assumed that the Bank assumed the payment of the note secured by the mortgage. That "understanding" or assumption on his part, according to his own testimony, was not suggested or inspired by anything expressly said by the defendant Bank's trust department officers, with whom he directly dealt in all the transactions pertaining to the transfer of the land to said Bank, nor did those officers or any officer of the Bank use any language from which such an agreement could be implied. It will not, of course, be contended that the as-

sumption of the debt secured by the mortgage by Stanforth & Blair, if, in truth, they really did assume it, would of itself bind the defendant Bank in that particular, or, in other words, that such agreement by Stanforth & Blair, if any such was, in fact, entered into with Raney, was tantamount to an agreement on the part of the defendant Bank to satisfy the obligation to secure which was the purpose of the mortgage, since, manifestly, such a position could only be maintained upon the theory or hypothesis that Stanforth & Blair, in the transaction ending in the purchase of the land from Raney, were acting and did act as agents of and for said Bank and were authorized as such by the Bank to make such an agreement for it, but such a theory or hypothesis is wholly without any support or justification from any evidence. brought into the case. Indeed, the uncontroverted fact in this case that a trust relation as to said land was created between the Bank, as trustee, and Stanforth & Blair, as beneficiaries, completely negatives any such a theory.

[10] In stating that the fact that the Bank took the deed to the property as a trustee only stands in this record uncontroverted we have not lost sight of the fact that, in its affidavit filed in this case supporting its claim to a one-third portion of the crop produced on the land against any right of the receiver to maintain possession of the same, the Bank asserted that it was the owner of the land and leased it to the plaintiffs. And parenthetically it may here be suggested that even if it were true that he did not know before and at the time he conveyed to the Bank that the latter took the land as a trustee, Raney certainly knew it at the time the affidavit was filed. He so admitted in his testimony, and his letters. written to the Bank and Stanforth & Blair after the deed conveying to the Bank was delivered were all written upon the assumption that the Bank's interest in the conveyance was only that of a trustee. But it was not inconsistent with its relation as trustee to said property for the Bank to allege in said affidavit that it was the owner of the property. For the purpose of administering the offices of the trust, it was the owner of the land. [11] The Bank was the trustee of an express trust (Code Civ. Proc., sec. 369), and had it sued to recover moneys due the trust estate, or for damages for trespass

upon the trust property, being the holder of the legal title thereto, the Bank could have sued in its own name and without the joining therein as coplaintiffs the *cestui que trustent.* (Code Civ. Proc., sec. 369, *supra; Lauer* v. *Williams,* 32 Cal. App. 590, 594 [163 Pac. 687], and cases therein cited.) And in stating in the complaint that it was the owner of the land, it would tell the truth, so far as the purposes of the action were concerned, and still would say nothing which could be taken as in derogation of its real or true legal relation to the property, or necessarily as proof of its absolute ownership. So, in the present case, the Bank's statement in the affidavit that it. was the owner of the land was not intended as setting forth the claim that it was the absolute owner of the land but only such owner for the purpose of administering the affairs of the trust. This, as we have said, was known to Raney at the time the affidavit was filed. As against the admitted fact that the Bank was acting merely as a trustee as to the property, said statement in the affidavit referred to was wholly devoid of force as proof that the Bank held the absolute or an unqualified fee in the land.

It is deemed the more orderly to consider now the point urged here by the defendant Raney that, even if the Bank took the property for the benefit of Stanforth & Blair or as trustee for the latter, the transaction, as a trust, is absolutely void by virtue of the terms of sections 869a, 2221 and 2222 of the Civil Code.

The section first named was passed by the legislature of 1923 (Stats. 1923, p. 275). It in substance provides that any conveyance of real estate or interest therein, which has been, or hereafter is made to any person or persons in trust, or where such person or persons is or are designated "trustee" or "as trustee" or "trustees" or "as trustees," and no beneficiary be indicated or named in said conveyance, it shall be presumed that the grantee or grantees, as the case may be, holds or hold the title to the estate or interest therein absolutely in his or their own individual right and free from any trust, and a conveyance executed by such grantee or grantees, whether purporting to be the act of such grantee or grantees in his or their individual right, or in his or their capacity as trustee or trustees, shall *prima facie* convey such title or interest to his or their grantee

or grantees; that, as to a conveyance by such trustee or trustees in their capacity as such, such presumption shall be conclusive as to an undisclosed beneficiary of such trust and the original grantor or trustor and anyone claiming under them, in favor of a purchaser or encumbrancer in good faith and for a valuable consideration, upon the filing of such conveyance for record in the office of the county recorder, etc. The section further provides that, as to such conveyance so filed prior to the taking effect of said section, such presumption shall not become conclusive except in favor of a purchaser or encumbrancer in good faith and for a valuable consideration, until one year after the taking effect of "this act," when it shall become conclusive without qualification whatsoever, "and no action to avoid or impugn any such conveyance . . . shall be commenced after the time when such presumption becomes conclusive as hereinbefore provided," etc.

No agreement in writing to the effect that the Stanislaus County land was to be held by the defendant Bank in trust for Stanforth & Blair was made between said parties. Stanforth testified, however, that for a long period of time prior to the date of the conveyance of the land in question to the defendant Bank, and to and including said date, the latter had managed and handled and was managing and handling, under a trust agreement, a number of other and different pieces of real property, situated in different localities belonging to or owned by him. Among the property so handled were, as we have shown, the interests in the Madera County land, as to which, as also shown, there was a trust agreement in writing. He stated that, following his custom of having all his real property and real estate deals so managed by said Bank, he and Blair caused the conveyance of the Stanislaus land to be made to the defendant Bank for the same purpose—that is, to be held and managed by the Bank in trust and for the benefit of him and Blair. [12] But, conceding that the trust as to the Stanislaus County land is void under the code section above named, in so far as are concerned innocent purchasers or encumbrancers of said land, for a valuable consideration, it was not void as between the Bank and Stanforth & Blair. The latter having paid the consideration for the transfer of the property to the Bank, a trust is presumed to result in their

favor (Civ. Code, sec. 853), and a court of equity would
promptly enforce it. But all these propositions are not
of controlling or, indeed, any special importance in the
decision of the question now in hand. The single question
here is whether the defendant Bank, upon taking the con-
veyance, assumed the payment of the debt secured by the
mortgage, and, there being shown no express agreement that
it did, the question whether the conveyance was taken
by it in trust for Stanforth & Blair or in its own right was
one of singular evidentiary importance in that respect, and
this is equally true whether the trust was or was not void
for the reasons and the purposes specified in section 869a
of the Civil Code or under the terms of sections 2221 and
2222 of said code. [13] If, to illustrate, the Bank, as we
hold is shown to be true, took the conveyance merely as
a trustee, then that fact, regardless of whether the trust
was void under the sections above named or for any rea-
son, would not only be competent but convincing evidence
that the claim that it assumed the payment of the note
secured by the mortgage was not true or well founded.
Counsel for Raney have not made it clear in their briefs
precisely what their claim is as to the effect of the in-
validity of the trust, if, as they claim, it is invalid or void
as to the persons named in section 869a, upon the question
whether the Bank took the conveyance in its own right
or only as a trustee. It may be that the theory was that,
since, as is the claim, there was, as to said land, no written
trust agreement in which beneficiaries were indicated or
named, and none indicated or named in the conveyance to
the Bank, the presumption would follow that the land was
not taken in trust but in the Bank's own right, as an
absolute conveyance to it. (Code Civ. Proc., sec. 1963,
subds. 19 and 33.) But, if such a presumption were per-
missible in that connection or possesses any force as evi-
dence that the Bank accepted the conveyance in its own
right and not as a trustee, it is more than met and we think
is dispelled by the uncontradicted positive testimony in the
case, reinforced by the same presumption, possessing equal
if not greater compelling probative force than as applied
above, following from the proposition that a savings bank
is absolutely prohibited by the laws of this state from deal-
ing or trading, either directly or indirectly, in real property.

save and except in several instances, which are indicated in section 61 of the State Bank Act, and of which the case here is not one. (Sec. 61 and also sec. 62, Act. 652, Gen. Laws of California 1923, pp. 202, 209.)

But there is advanced another theory upon which it is claimed that liability for the deficiency judgment should be decreed against the appellant. It is this: That the evidence discloses that the appellant, at the time the transfer was made, did not impart to Raney information that it was taking the conveyance merely as trustee for Stanforth & Blair, or, in other words, did not explain to or inform Raney that it (appellant) was not taking the property in its own absolute right, as the deed of conveyance upon its face indicates. The significance of this contention is, obviously, that, having been given no such information, either by the bank officials or Stanforth & Blair, Raney was justified in inferring that Stanforth & Blair, in negotiating and consummating the exchange of the properties, were in truth and in fact acting for said Bank, and that as such representatives or agents were authorized to agree for the Bank to assume the payment of the deficiency judgment, Raney having testified that Stanforth & Blair did agree to assume such payment, that, at all events, the silence of the parties, at the time the transfer to the Bank was suggested and made, as to the true relation to the property that it was intended that the Bank should sustain, should be sufficient to foreclose any right in the Bank now to claim immunity from liability for the deficiency judgment.

[14] At the outset, it is well enough to state that, after a most careful and painstaking examination of the testimony, we have been convinced, as we have heretofore declared, that Raney, at the time he conveyed the land to the Bank, well knew, or, at least, from all the facts and circumstances attending the making of the conveyance with which he was perfectly familiar, ought to have known that the deed to the Bank was accepted by the latter solely in trust for Stanforth & Blair. In announcing this conclusion, we are not forgetful of the rule so thoroughly established and understood, that where there is a substantial conflict in the evidence addressed to the fact or facts in issue, the decision thereon in the court below cannot be disturbed without an arbitrary disregard of the limitation placed by

the constitution upon courts of review in the matter of considering and reviewing on appeal the evidentiary phases of a case. But we think there is practically no conflict in the evidence upon the point now being considered, as will presently be made to appear.

In considering the question now before us, these propositions must be borne in mind: That Raney and the plaintiffs, in attempting to establish the Bank's liability for the deficiency judgment, and to that end, in attempting to show that, if the Bank took as trustee, knowledge of that fact was withheld from Raney when the transfer was made, are practically relying upon the doctrine or defense of estoppel *in pais,* or estoppel by conduct by reason of silence when it was the duty of the party thus sought to be estopped to speak; that this defense often means, as it means in this case, that the tongue of the party against whom it is invoked is silenced against the right of uttering the truth as to a matter involving a substantial right; [15] that, as to the defense of equitable estoppel, particularly where it is set up as against the assertion of a substantive right, and the ground of the estoppel is conduct by silence on the part of the party against whom the defense is pleaded, "the facts proved must be such that an estoppel is clearly deducible from them." (*Wheaton* v. *North British & M. Ins. Co.,* 76 Cal. 415, 429, 430 [9 Am. St. Rep. 216, 18 Pac. 758].) In other words, estoppel by conduct founded upon the silence of the party whose duty it is to speak and so expose all the material facts of a transaction which are within his knowledge and of which the other party is ignorant involves an implied representation of the existence of the apparent facts of the transaction, and, to justify a prudent man in acting upon it, "it must be plain, not doubtful, or matter of questionable inference." (Bigelow on Estoppel, 5th ed., pp. 570 and 578.) As that author further says at page 578, same edition, "*Certainty* is essential to all estoppels. The courts will not readily suffer a man to be deprived of his property where he had no intention to part with it."

With the above principles before us, the testimony bearing upon the defense of estoppel will be considered.

In taking up for consideration Raney's testimony, we may well start with these undisputed facts: That he was

himself a banker, being the president of the bank with which he was connected, and that he was not alone presumptively but also presumably actually familiar with the laws of the state governing the banking business in all its phases; that, accordingly, he is to be assumed as well as presumed to know, and to have known at the time he conveyed the land to the defendant Bank, that a savings bank cannot, under the laws of this state, acquire title to real property, either by purchasing the same or exchanging property for it, except in the cases enumerated in the State Bank Act, *supra*, and within which exceptions the case here does not fall; that all his dealings with the Bank relative to the land in question were entirely with the trust department of the Bank and the trust officers thereof.

After detailing the facts and circumstances of the negotiations leading to the execution of the agreement of sale and purchase by him and Stanforth & Blair, Raney testified, giving his testimony in substance only: That, upon the completion of the contract for sale of the land, the papers or deed and agreement of sale were to be deposited with the defendant Bank in escrow, and so remain pending the examination of abstracts of title of the properties to be exchanged and a report thereon; that the provisions of the written agreement of sale were to be accepted as setting forth the escrow instructions; that after the matter of the title to the respective properties was satisfactorily adjusted and approved, he caused a deed to be prepared conveying the land to Stanforth & Blair; that thereafter the latter instructed Raney to convey the property to defendant Bank; that he made no inquiry either of Stanforth & Blair or the Bank as to the reason for the conveyance of the land to the latter; that, after being so instructed, he went to the trust officers of the Bank and asked if it would be "satisfactory" to the Bank to make the deed to it, to which question said officers replied in the affirmative, and that thereafter he changed the grant so as to make the Bank the grantee, and also erased from the deed, at the request of Blair and the Bank, a covenant therein contained as originally prepared to the effect that Stanforth & Blair were to assume the payment of the debt secured by the mortgage. "Stanforth & Blair," Raney proceeded, "were to assume and pay the mortgage; they were the ones who originally agreed

to it.. Nobody else ever agreed to it. I had no talk about this assumption and payment by anyone else except Stanforth & Blair. I had no talk about whether—with the Bank—whether they would assume it.'' Prior to the delivery of 'the deed to the Bank and after it was understood by him that the conveyance was to be to the Bank, Raney addressed a letter to defendant Bank, which, at the beginning of the page, bore the words: ''Attention, Mr. Vianello,'' trust officer of the Bank with whom Raney testified he principally conducted the transactions involved herein. Said letter in part, read:

''I hand you herewith an offer signed by Messrs. Stanforth & Blair on a piece of property that they are purchasing from me, and also my acceptance of same. This offer recites full details of escrow arrangement. Herein you will notice that said contracts now held by you are to be assigned to me. I will appreciate it if you will get these contracts assigned at your earliest possible convenience. I have ordered certificate of title covering on the property I am selling to Messrs. Stanforth & Blair, and as soon as the said certificate is completed I will send it to you along with a deed made in your favor viz.: Fidelity Trust & Savings Bank of Fresno, California. . . In my talk with you personally, some ten days ago, you expressed the opinion that you thought the contracts were all good ones and held by people that would pay up satisfactorily. At any rate I would deem it a special favor if you would be good enough to write me a letter just giving a general outline of each contract in accordance with what you think of them, especially the addresses, and whether you think they will make improvements as called for on the contracts in each case, whether you think they will go on the land personally in any case, and also your opinion as to their financial standing and ability to carry out the contracts. I do not expect you to put yourself on record in this matter any more than to just give me a general outline such as you talked with me in person. If you will do this I will attempt in some way to show my appreciation.''

Raney testified that some ten days prior to the date of the above letter (August 13, 1920), he had a conversation with Mr. Vianello, the trust officer of the Bank, in which the latter explained to Raney ''about the value of the

various Madera County contracts and the amount of them. I thought at the time it was an acceptance of those for and on behalf of Stanforth & Blair. There was," Raney continued, "a question in my mind for awhile—I think for a long time, what the Bank's connection was, when I was asked to deed it to them."

A letter, under date of August 31, 1920 (four days prior to the execution and delivery of the deed to the Bank), was addressed by Raney to Stanforth & Blair, in which he apologized for the delay in delivering the deed, explaining, though, that, while "the abstract could have been over promptly," still he "figured it was best for all concerned that an unlimited certificate of title be issued, and it has taken longer than I figured to get it, but it is now absolutely clear and ready." Another reason for the delay, he added, was the absence of plaintiffs' attorney on a vacation, "and they have deferred making out the papers until now for the reason that Mr. Reeder (said attorney) attends all such matters and they (plaintiffs) insisted that he close this matter up. The papers are now made out," Raney proceeded in said letter, "and as soon as I can get Mrs. Brichetto's signature (at the present time she is in San Francisco) they will be immediately forwarded to the Bank *as agreed upon.* In fact, I think I will have them sent through the abstract company here and a letter can accompany them setting forth the condition of title, and withholding the issuance of such title until the transfers are made, so when it is issued it can be brought down showing it in your name, or rather the name of the Fidelity Trust and Savings Bank. This, I imagine, will be what you want. I feel and hope that these papers will be in the Bank's hands by September 4, and I am writing to assure you they are on their way." In the same letter was the following written in red ink: "There is one redeeming feature of this delay and that is that the mortgage will be dated later, thereby saving us quite an item on interest."

Raney stated that a copy of the foregoing letter was forwarded to defendant Bank. A letter addressed to the defendant Bank by Raney and dated September 3, 1920, and at the beginning of which on the paper on which it was written were the words, "Attention Mr. Vianello," stated, in part: "Enclosed please find deed from myself to your

Bank conveying," describing the land in question. "I also enclose," continued said letter, "an unlimited certificate of title issued by . . . covering on this property, and showing it to be in the name of L. F. and George Brichetto, free from all incumbrances, except taxes for the present year not yet payable, and which are assumed by Stanforth & Blair. . . . I also enclose a crop lease in duplicate from yourselves to Brichetto Brothers. . . . This deed and these papers are, of course, sent to you in trust under the escrow agreements and instructions, wherein they are not to be delivered until certain contracts mentioned in the escrow agreement (offer and acceptance agreement) have been assigned to me. . . . You will also note that the escrow instructions call for an unlimited certificate of title covering the property covered by the various contracts to be assigned to me, showing it to be free and clear of any and all incumbrances, save the mortgage to the Berkeley bank."

Raney explained that he inclosed with the above letter the lease from the Bank to Brichetto Brothers for the Stanislaus County land because "it was part of my transaction with Stanforth & Blair that I agreed to secure for them a tenant. . . . This is the lease I made by reason of my arrangement with Stanforth & Blair. . . . The Brichettos, the tenants in this lease, are the same parties who are plaintiffs in this action. I bought this land from Brichetto Brothers and put a mortgage on it in their favor for $45,000.00. I was instrumental in securing this lease as a part of that transaction." Raney testified that the agreement for the exchange of the properties was completed by the delivery of the receipt to him by the Bank of the contracts covering the Madera County lands, his receipt therefor to the Bank being dated Septembr 7, 1920.

In a letter addressed by Raney to Stanforth and dated September 26, 1920, the latter asked Stanforth if he (Stanforth) "cannot help me" regarding the taxes on the Madera County lands. "I have never received my tax notice," he stated in said letter, "but I imagine that either you or the Bank have received such notice. . . . Also let me know how you have handled the taxes in the past. I imagine you or the Bank have paid them and then have collected *pro rata* from the different contract buyers. Awaiting your early advice," etc.

Raney addressed to defendant Bank a letter under date of December 24, 1920, in which he informed· said defendant that the several contracts that he "took over from Stanforth & Blair" had been turned into trust deeds "and are held as collateral by the Berkeley Bank of Savings and Trust Company."

A letter, dated April 18, 1921, was written and sent by Raney to Stanforth & Blair, which contained some significant statements. The letter is quite lengthy but the more important portions may be extracted without garbling or perverting the meaning thereof. "I am just in receipt of a letter from the . . . Bank" (appellant), stated the letter, "in reference to the payment of a certain amount of interest on the mortgage connected with the Madera contracts. That I assure you was a surprise . . . for it was not specified in our agreement. . . . In all fairness it seems to be up to me·to take care of and reimburse you for a certain amount of interest. . . . I am somewhat uncertain and doubtful . . . just when this interest should start. . . . It seems to me that arriving at what is absolutely just and fair, Sept. 4th should be the date to commence my interest liability rather than August 9th. I would also like to call your attention to what I think is an error on the Bank's part and be to your interest namely, that the mortgage in question was paid by me to the Berkeley bank in November 6, 1920, and therefore they should not pay interest up to December 15th and charge you with it."

There were many other letters passing between Raney and the defendant Bank and Stanforth & Blair of the same general tenor or practically upon the assumption that the Bank as to this land was merely acting as a trustee for Stanforth & Blair.

Raney, it is true, repeatedly declared in his testimony that, when he delivered the deed to the Bank, he did not know that the Bank's position in that transaction was that of a trustee only, nor, so he stated, did he learn that such was the fact until about a month after the deed was delivered to the Bank. All those asseverations, though, are not supported by the letters written by him to the Bank and Stanforth & Blair prior to and after the transfer of the Stanislaus County land was made to the Bank, nor by his testimony, reasonably interpreted. Typical of his testi-

mony in general is the following, elicited on cross-examination: "Q. Now, I am asking you if it was not Stanforth & Blair who was to assume and pay this mortgage? A. They were the ones that originally agreed to it, yes. Q. Did anybody else ever agree to it? A. No. Q. By Mr. Maddux (Raney's attorney, interrupting): What do you mean by that, 'nobody else ever agreed to it?' A. I had no talk about this assumption and payment by anyone else except Stanforth & Blair; I had no talk with the bank whether they would assume it. Q. (By bank's attorney, resuming cross-examination): You knew, didn't you, Mr. Raney, during all these negotiations that the . . . bank was not the principal in the matter? A. I did not. Q. Who first approached you concerning the sale of this land in this county? A. Mr. Grigsby, . . . He was a real estate agent or broker, at Fresno. Q. He discussed with you then the matter of making an exchange of certain property? A. Yes, sir. Q. And during all those negotiations you were informed that Stanforth & Blair had equities in properties in Madera County? A. Yes. . . . Q. You were willing to make an exchange of your land (Stanislaus County land) for these equities—so-called equities—in the Madera County land—is that not correct? A. After I had looked up those equities, yes. Q. Now, then, during these negotiations you were informed, weren't you, that those Madera County lands were held in trust for Stanforth & Blair by the bank. A. No. Q. Now, didn't you know anything about that at all? A. I did not. I knew the bank held title to them. I didn't know what way they held them. Q. You never inquired, did you? A. No. Q. You never asked the bank how it happened that they were holding those, did you? A. No. Q. And every time you dealt with the bank you dealt with the trust officers, didn't you? A. I did. Q. And you were in the trust department of this bank during all those negotiations, weren't you? A. Yes. Q. The bank never made any offer to convey to you any land whatsoever or to transfer to you any equities in any contract, did it? A. Yes, they agreed to transfer these contracts on the Madera County land that they held title to. Q. Now, wasn't that the agreement you had with Stanforth & Blair and not with the bank? A. Stanforth & Blair made one agreement and then I talked with the bank and got the

understanding from them that they would. Q. But now, Mr. Raney, wasn't it simply the proposition that the bank was carrying out the agreements that Stanforth & Blair made—isn't that it? A. I didn't know what it was. Q. Well, now, as a matter of fact, didn't you know that that was it? A. I did not. I never saw any evidence of it. Q. Did you have any agreement at all with the bank that they would buy your land in this county? A. No. Q. It never at any time agreed to transfer to you any property, did they, in exchange for your property? A. Yes, they did. Q. And all the negotiations were with reference to this exchange of that property with Stanforth & Blair, wasn't it? A. Originally; until later on— (interrupted). Q. Then in order for Stanforth & Blair to carry out that agreement you went to the bank, didn't you? A. Stanforth & Blair started and the bank finished it. . . . It was agreeable to the bank. Q. It was agreeable to you for the bank to finish it, wasn't it? A. Yes; I didn't question the men when they asked to deed it to the bank; that was satisfactory to me for the bank to take title to it. Q. You were putting the matter in escrow with the bank so the bank would represent you in the transaction also, didn't you? A. Yes, I did; I sent the papers up to them which were not to be turned over until I got certain papers.'' Raney proceeded to say that at the time the agreement of sale (the offer and acceptance), which was signed by him and Stanforth & Blair was sent by him (Raney) to the Bank, with the other papers mentioned above, he did not know that the land was to be conveyed to the Bank. He was thereupon asked, on cross-examination: ''When this negotiation was had leading up to the signing of this, Raney—defendant's exhibit 22 (the agreement of sale), you knew that the . . . Savings Bank (defendant bank) had in trust those various agreements and equities on the Madera County lands, didn't you? A. I knew then that they had title; I didn't know what shape it was in trust.'' At this point counsel for defendant Bank called Raney's attention to his letter to the Bank, under date of August 13, 1920, or four days after Raney executed his written acceptance of the offer of Stanforth & Blair, and of which certain parts are hereinabove reproduced, and he admitted writing said letter. ''Up to that time,'' testi-

fied Raney, referring to the time of writing said letter, "I
was dealing with Stanforth & Blair alone, as far as I knew.
Q. (By counsel for bank): In this contract it is recited:
'that these contracts are in trust'—'said contracts are to
remain in trust at the Fidelity Trust and Savings Bank,'
reading now from exhibit 22 (offer and acceptance), so
that your statement is incorrect, is it, Mr. Raney, to the
effect that you did not know before the writing of this letter,
dated August 13, 1920, that the bank had anything to do
with it. That is not correct, is it? A. That is the first
time I knew that they were to take a deed to it. Q. That
is what you meant? A. That I should deed it to them
direct. Q. Now you had previously—some days prior to
the writing of that letter of August 13, 1920—had a talk
with Mr. Vianello, the trust officer of the bank, had you?
A. Yes. Q. And during that talk he had explained to you
the holding by the bank of these various Madera County
contracts, hadn't he? A. He explained about their value
and the amount of them. Q. Yes; and it was an acceptance
of those for and on behalf of Stanforth & Blair, wasn't it?
A. Well, I— Q. You thought so, didn't you, at the time?
A. I took it so at the time, yes. Q. Yes, and always have
thought so since, haven't you?" To which Raney returned
the answer given above in connection with the reproduction
herein of parts of his letter to Stanforth & Blair, under
date of August 31, 1920.

Enough from Raney's testimony is thus given to show
that no other conclusion can rationally follow therefrom,
when considered in connection with his letters to the Bank
and to Stanforth & Blair, and the fact that he is himself
a banker, and the further fact that his dealings with the
Bank in all these transactions were with the trust depart-
ment thereof, than that he well knew, at the time he con-
veyed the Stanislaus County land to the Bank, that the
latter was taking said conveyance merely as a trustee for
Stanforth & Blair. It is plain from reading his testimony
that he was more or less evasive in replying to pointed ques-
tions upon the subject of his knowledge respecting that
matter. His statement at one time that he did not know,
at the time the agreement of sale was finally executed by his
written acceptance thereof on the very sheet of paper upon
which the offer of Stanforth & Blair was written, that the

Madera land contracts were then being held in trust by the defendant Bank for Stanforth & Blair, is not entitled to any credence whatever, assuming, as we must assume, that he was and is a man at least of average intelligence and possessed of that degree of business sagacity which is always to be expected in a person entrusted with and capable of assuming the responsibility of administering in a proper way the functions of a bank president. It is not at all probable that such a man would enter into and carry out transactions of such magnitude—transactions involving the purchase and sale or exchange of properties valued at many thousands of dollars—without first thoroughly investigating and so becoming conversant with every vital phase thereof— the conditions of the sale or exchange, the value of the property he was to receive, the title, legal and equitable, if thus it was divided, in whom such title rested, and the many other incidents attending the inauguration and consummation of such transactions. Indeed, we are justified in declaring, upon the question whether he knew at the time he transferred the land to the Bank, the latter was taking it only as a trustee, Raney's testimony is inherently improbable. **[16]** At any rate, it is perfectly clear that the plea of estoppel upon which he and the plaintiffs undertake to establish and fix liability upon the defendant Bank for the deficiency judgment herein entered is not supported by his or any other testimony received in the case, either documentary or oral, with the degree of certainty which is and should always be required before a court of equity will, solely upon such plea, interpose to deprive a person of his property. Even if Raney, before transferring the property to defendant Bank, was without actual knowledge of the fact that the Bank was to take the property in no other capacity than that of a trustee, he ought and would have learned that fact by the prosecution of an inquiry upon the circumstances of which he had actual notice (which are hereinabove fully stated and frequently adverted to) and which were sufficient to put him, as a prudent man, upon inquiry as to the legal relation to the property or to Stanforth & Blair with reference thereto that the Bank thus proposed to assume. (Civ. Code, secs. 18, 19.) The statement in the agreement of sale between him and Stanforth & Blair that the Madera land contracts were then held in

trust by the defendant Bank and the provision therein that they were to remain in trust with said Bank were themselves sufficient so to operate upon the mind of a party to the transaction as to put him, as a prudent person, upon inquiry as to the specific purpose for which he was, by the request of Stanforth & Blair, to transfer title to the land to the Bank, with which previously he had had no dealings relative to the negotiations between himself and Stanforth & Blair of which said agreement was the culmination. As has been shown, Raney, after having been told by Stanforth & Blair to make the deed to the Bank, manifested no interest in such request other than to know that such transfer would be satisfactory to the Bank.

It is not necessary to examine in detail herein the testimony given by the witnesses for the defendant Bank upon the question of Raney's knowledge of the fact before and at the time of the conveyance of the land in question to said Bank that the latter took the conveyance as a trustee. It will be sufficient to repeat that both Vianello and Stanforth positively testified that they explicitly stated to Raney, prior to the date the conveyance was made, that the Bank was to take the deed to the land as a trustee for Stanforth & Blair, and that the Bank was interested in the land to that extent only.

The judgment as to the defendant and appellant Bank is reversed.

Plummer, J., and Finch, P. J., concurred.

A petition by respondents to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 15, 1926.